UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CLARE MIKESH,                                       CIVIL NO.  03-5752 (RHK/JSM)

      Plaintiff,

v.                                                  <u>REPORT AND RECOMMENDATION</u>

GALE A. NORTON, Secretary U.S.
Department of Interior,

      Defendant.

      JANIE S. MAYERON, U.S. Magistrate Judge

      The above matter came before the undersigned United States Magistrate Judge on upon defendant's Motion to Dismiss, Alternatively for Summary Judgment [Docket No. 15].

      Richard Wylie appeared on behalf of plaintiff; Patricia Cangemi appeared on behalf of defendant.

      The motion has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

      Based upon the pleadings, and for the reasons discussed below, it is recommended that defendant's Motion to Dismiss, Alternatively for Summary Judgment [Docket No. 15] be GRANTED.

## I.    <u>FACTUAL BACKGROUND</u>

      On September 5, 2001, plaintiff Clare A. Mikesh ("Mikesh") resigned from her employment at the U.S. Fish and Wildlife Services ("FWS").  MSPB Ex. 1-a, Attach. 5.

On October 17, 2001, Mikesh filed a discrimination complaint with the U.S. Department of Interior.  ROI Ex. 2, Attach. 1.  On March 25, 2003, the Department of the Interior determined that that Mikesh's "choice to resign did not rise to the level of constructive discharge" and that Mikesh "was not discriminated against based on sex, disability, and reprisal."  MSPB Ex. 1-a, Attach. 1, Final Agency Decision ("FAD"), at 15.  On April 25, 2003, Mikesh appealed this decision to the Merit Systems Protection Board ("MSPB").  MSPB Ex. 1-a, Attach. 1.  On August 23, 2003, the MSPB issued its Initial Decision, finding that Mikesh's resignation was not involuntary and that consequently, the MSPB did not have jurisdiction to adjudicate the discrimination claims.  MSPB Ex. 1-a, Attach. 26, at 13-14.  The MSPB decision became final on September 27, 2003.

On October 27, 2003, Mikesh filed a Complaint in this Court.  [Docket No. 1].  In this suit, Mikesh alleges she suffered discrimination based on gender, in violation of 42 U.S.C. § 2000e-16, (Title VII), discrimination based on handicap and on account of FWS's failure to provide reasonable accommodations to her, in violation of 29 U.S.C. § 791 et. seq., (Rehabilitation Act), and discrimination based on retaliation for requesting reasonable accommodations and making complaints of discrimination against FWS, in violation of Title VII and the Rehabilitation Act.  Compl. ¶¶ 1, 14-21.  Mikesh also seeks review of the MSPB decision under 5 U.S.C. §§ 7513, 7703, which found that her resignation from FWS on September 5, 2001 was not involuntary.  Compl. ¶¶ 1, 22-24.

II.     **STANDARD OF REVIEW**

A.      **Mixed Petition**

Mikesh sought review of the MSPB decision, which determined that the Board did not have jurisdiction over her appeal of her termination because it was not involuntary.  In addition, Mikesh has alleged that defendant discriminated against her based on her disability, gender, and prior EEO activity.  Because Mikesh has filed a complaint that combines claims based on discrimination and on the adverse agency action, this is a mixed case.  Crawford v. Runyon, 37 F.3d 1338 (8th Cir. 1994).

In mixed cases, "the adverse agency action is reviewed on the administrative record, while the discrimination claim is reviewed de novo."  Crawford, 37 F.3d at 1340; Mason v. Frank, 32 F.3d 315, 317 (8th Cir. 1994) ("The district court reviews the discrimination claim de novo and the nondiscrimination claim on the administrative record under 5 U.S.C. § 7703(c).").

In addition, "[p]ursuant to section 7703(c), a court shall, upon review of the administrative record, set aside an MSPB decision only if required procedures have not been followed, the decision is arbitrary, or the decision is not supported by substantial evidence."  Mason, 32 F.3d at 318 (citing Maulding v. Sullivan, 961 F.2d 694, 698-99 (8th Cir.1992), cert. denied, 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 653 (1993)); Crawford, 37 F.3d at 1340-41 ("Under 5 U.S.C. § 7703(c), the administrative decision must be affirmed unless it was arbitrary, capricious, an abuse of discretion, procedurally infirm, or not supported by substantial evidence.").[1]

---

[1]      Specifically, 5 U.S.C. § 7703(c) states the following:

**B.**   <u>**Motion to Dismiss**</u>

When evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6), courts must view the complaint in the light most favorable to the non-moving party and may dismiss the complaint only if no relief can be granted under any set of facts that could be proven consistently with the complaint's allegations. <u>Alexander v. Peffer</u>, 993 F.2d 1348, 1349 (8th Cir. 1993) (quoting <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984)).  However, "the court need not accept, as true, wholly conclusory allegations, or unwarranted factual inferences.  Moreover, in treating the factual allegations of a complaint as true, the court does not, however, blindly accept the legal conclusions drawn by the pleader from the facts." <u>Helleloid v. Indep. Sch. Dist. Number 361</u>, 149 F.Supp.2d 863, 867 (D. Minn. 2001).  To avoid dismissal under Rule 12(b)(6), the "complaint must contain sufficient facts, as opposed to mere conclusions, to satisfy

---

(c) In any case filed in the United States Court of Appeals for the Federal Circuit, the court shall review the record and hold unlawful and set aside any agency action, findings, or conclusions found to be--

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) obtained without procedures required by law, rule, or regulation having been followed; or

(3) unsupported by substantial evidence;

except that in the case of discrimination brought under any section referred to in subsection (b)(2) of this section, the employee or applicant shall have the right to have the facts subject to trial de novo by the reviewing court.

5 U.S.C. § 7703(c)

the legal requirements of the claims." DuBois v. Ford Motor Credit Co., 276 F.3d 1019, 1022 (8th Cir. 2002).

### C.   Summary Judgment

In this case, defendant has stylized her motion as a "Motion to Dismiss, Alternatively for Summary Judgment."  Defendant submitted numerous documents for the Court to consider in connection with the motion.  Therefore, to the extent that defendant relies on information outside of the pleadings, items not in the public record or documents not referenced by Mikesh in her Complaint, defendant's motion will be treated as a motion for summary judgment. See Fed. R. Civ. P. 12(b);[2] Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir.1999)("When considering a motion for judgment on the pleadings (or a motion to dismiss under Fed. R. Civ. P. 12(b)(6)), the court generally must ignore materials outside the pleadings, but it may consider 'some materials that are part of the public record or do not contradict the complaint,' as well as materials that are 'necessarily embraced by the pleadings.'")(citations omitted).

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celeotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999).  "[S]ummary judgment procedure is properly regarded not

---

[2]     Rule 12(b) provides in this regard: "If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."

as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327. "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" DePugh v. Smith, 880 F.Supp. 651, 656 (N. D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed. Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995). "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial." Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, at *4-5 (D. Minn. 2003) (citations omitted). The non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy." Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995).

II.    **DECISION**

    A.    **MSPB Proceeding**

        1.    **The MSPB Record**

    This Court's review of the MSPB decision is based on the administrative record of the MSPB.   Crawford v. Runyon, 37 F.3d 1338, 1340 (8th Cir. 1994).   The pertinent facts of the record bearing on defendant's motion for summary judgment are as follows:

    Mikesh began working for FWS in 1987.   Ex. 1-c, "Hearing Transcript" ("Tr."), at 7, 8.   In 1989, she was hired for a financial position in the Engineering Department of FWS.   Tr. at 8.   In 1995 or 1996, through experience and promotions, Mikesh earned the position and title of Budget Analyst in the Engineering Division.   Tr. at 8.   She maintained that position until she resigned in 2001.   Tr. at 11.

    Mikesh testified that in February 2001, she was told by her psychologist that she needed to take two weeks off because she was very suicidal and that if she did not take time off from work, she would have been hospitalized.   Tr. at 25.   Mikesh took one week off and then her boss, Rod Hartlieb,[3] called to tell her she needed to go back to work or they would fire her.   Tr. at 25.   In March 2001, Mikesh testified that she needed another surgery on her right rotator cuff. Tr. at 25.

    Mikesh testified that she informed FWS about her disabilities in a letter detailing her medical status, including migraines and depression and substantiated this with a letter from her doctor indicating these issues and the other surgeries she had.   Tr. at 49-

---

[3]     At all times pertinent to this case, Rod Hartlieb was a Regional Engineer for FWS and Mikesh's immediate supervisor.   He began his duties as a Regional Engineer in December 2000.

50. Specifically, on March 12, 2001, Mikesh replied to Hartlieb's March 6, 2001 letter.[4]

MSPB Ex. 1-a, Attach. 24.   Mikesh stated that she had only three unscheduled

_____

[4]      There is no March 6, 2001 letter in the administrative record.  However, at the hearing, the Court requested that defendant provide to the Court the record relied upon by the Department of Interior to issue its Report of Investigation (ROI).  (The ROI was part of the administrative record).  The Court cites to ROI record only by way of background.

In the ROI record, the Court found a letter dated March 7, 2001, from Hartlieb to Mikesh regarding leave usage.  ROI Ex. 2, Attach. 13.  In that letter, Hartlieb indicated that he had discussed his concerns regarding Mikesh's absenteeism, most of which was unplanned, with her several times.  Id.  Hartlieb stated that the unplanned absences were disruptive to the Division because Mikesh was not present to help him understand the budget process, and answer questions from staff, vendors, and customers concerning budget and financial matters.  Id.  Hartlieb noted that, since he became Regional Engineer in December 2000, Mikesh had used 42 ¼ hours of annual leave and 32 hours of credit hours, that she had been absent for some part of all pay periods, and that she had an extremely low leave balance for someone with 18 years of continuous service (as of February 23, 2001, she had a balance of 13 ¼ hours of annual leave and a negative sick leave balance of 62 hours).  ROI Ex. 2, Attach. 13. Hartlieb also detailed that from June 6, 2000 until his arrival, there was only one pay period in which Mikesh was not absent using annual leave, LWOP, compensatory time off, or credit hours earned.  Id.  During that time, Mikesh used 184 ¾ hours of annual leave, 9 hours of compensatory time off, 48 hours of LWOP, and 17 hours of credit hours earned.  Hartlieb concluded that he saw a pattern of absenteeism.  Id.

After detailing her absences, Hartlieb listed the following instructions regarding attendance and leave approval procedures for Mikesh:

1.      Except in cases of illness or unavoidable emergency, you must obtain approval from me at least one day in advance for any absence from work or late arrival to work.  I will make the determination if an absence constitutes an unavoidable emergency based on the information you provide me concerning the reason for your absence.  Annual leave of a week or more must be scheduled a month in advance.  If I am absent, you must obtain approval from my acting.  If neither of us is available, leave a message and one of us will return your call.  Further, unless documented circumstances prevent otherwise, I expect you to call in yourself as opposed to someone else calling in on your behalf.  The purpose of this requirement is to enable us to discuss the circumstances and impact of your absence in addition to discuss what, if anything, you will be responsible to provide in order for your absence to be

approved.  Please note that no other employee has the authority to approve your use of leave (i.e. sick leave, annual leave, or LWOP). An unapproved absence will result in a charge of absence without official leave (AWOL) and AWOL is misconduct and can be the basis for disciplinary action up to and including removal from your employment with the U.S. Fish and Wildlife Service.

2.     You must observe the designated duty hours, which are from 7:00 a.m. to 3:30 p.m., unless you obtain official approval from me to change your hours.  If you have an unapproved late arrival to work, you will be charged with AWOL in fifteen (15) minute increments for the time you are not at work.

3.     If you are unable to come to work or need to leave early because of an illness or a medical appointment (for you or a family member), either using sick leave, annual leave, or requesting the approval to use LWOP, you must notify me by 9:00 a.m. if you are unable to come to work or as soon as possible if you need to leave early.  If I am absent, you must speak to my acting.  Calling in and talking to the receptionist or another employee or just leaving a voice mail message will not suffice.  I expect you to call in yourself as opposed to someone else call in your behalf.

In accordance with Title 5 of the Code of Federal Regulations (C.F.R.) Part § 630.403 concerning medical leave, a supervisor may deem it necessary for an employee to submit documentation in support of their absence.  In order for the absence to be approved, that documentation must be viewed as administratively acceptable by the supervisor.  Due to your frequent absenteeism, in order to have an absence approved for medical reasons, you will be required to provide documentation concerning the need for the absence from a licensed physician or other appropriate practitioner. That information must be provided on a SF-71, Application for Leave, or on the physician's letterhead stationary, regarding the duration of the illness or the length and type of medical appointment.  Depending on the circumstances, additional medical documentation may also be required that addresses the following:

1.     A brief description of your health condition;
2.     The date(s) you need(ed) to be absent from work due to a health condition; and
3.     The appropriate medical facts within the knowledge of the health care provider regarding the health condition, including a general statement as to the

absences since Hartlieb's arrival and all absences had been approved at the time of request.  Id.  Mikesh informed Hartlieb that she had been under a doctor's care for depression, migraine headaches, and rotator cuff damage.  Id.  She stated that such conditions do not permit her to plan when they would affect her.  Id.

Mikesh stated that her goal was to minimize unplanned time away from work and agreed that unplanned time away from work created problems for everyone.  MSPB Ex. 1-a, Attach. 24.  Mikesh also stated that her time away from the office since December 2000 had been earned and approved.  Id.  As to Hartlieb's statement regarding Mikesh's absence during a part of each pay period since December 2000, Mikesh stated that because of the recent change in scheduling that had taken away the "flex"

---

incapacitation, examination, or treatment that may be required by a health care provider.

ROI Ex. 2, Attach. 13.

Hartlieb further informed Mikesh that the doctor's certification should be provided to him when she returned to work, but no later than two weeks from the date she returned to work.  ROI Ex. 2, Attach. 13.  Additionally, Mikesh had to provide a doctor's certification in advance of any planned medical treatments that would make her absent from work.  Id.  Mikesh would be charged AWOL until such documentation was submitted and reviewed.  Id.  If Mikesh failed to submit a doctor's certification, she would be charged AWOL.  Id.  The doctor's certification would be used to determine whether Mikesh's absence was approved for leave of absence.  Id.

Mikesh was expected to comply with these instructions until Hartlieb noted appropriate improvement.  ROI Ex. 2, Attach. 13.  Harlieb stated that he hoped the imposed conditions would serve to correct Mikesh's absenteeism or provide him with information to accommodate any problems Mikesh may be having that were affecting her use of leave.  Id.  Finally, Hartlieb stated that if Mikesh believed that personal, medical, or other problems were the reasons for her many unplanned absences, she could provide him with the information concerning such problems, or contact the Employee Assistance Program or Hartlieb for assistance.  Id.

schedule, she was now using credit hours[5] that she had earned to replace the Fridays off that were on the schedule under the flex plan.  Id.

Mikesh then detailed her illnesses to illustrate that the leave she used was not frivolously wasted.  MSPB Ex. 1-a, Attach. 24.   Mikesh explained that over the past six years she had over ten oral surgeries to her face and teeth as the result of being hit in the face by a softball, which broke her jaw.  Id.  She had foot surgery in February 2000 as a result of a chronic debilitating injury to her left foot sustained during paratroop training in 1976.  Id.  Since 1996, she has suffered from extreme, unexplained, and unrelieved water retention, and from major depression that has been treated to a minor degree by medication.  Id.  While recovering from foot surgery, she fell and tore her right rotator cuff.  Id.  She underwent surgery on her shoulder, but it was re-injured and required more surgery.  Id.  She also has been hospitalized for low electrolytes, severe edema of her foot and legs, shortness of breath, and chest pains.  Id.  Mikesh stated that she has a deep and sincere commitment to being at work and performing her duties with a high degree of dependability and accuracy.  Id.

According to Mikesh, management wanted to curtail her sick leave so before her shoulder surgery, management presented a draft Resolution Agreement to her.  Tr. at 28, 57.  Specifically, on March 12, 2001, FWS presented Mikesh with a draft Resolution Agreement.  MSPB Ex. 1-a, Attach 24.  The Agreement stated that its purpose was to "allow the Employee a reasonable amount of time off in order to address medical problems with the intent of enhancing the quality of her employment and the quality of

---

[5]     According to Hartlieb, a person earns credit hours for working beyond an 8-hour day.   Def. Ex. F (Hartlieb Aff. submitted by defendant in connection with summary judgment motion), at 4.

her life outside work." Id.  The draft Resolution Agreement provided that Mikesh would voluntarily submit a request for leave without pay effective Sunday, March 18, 2001, not to exceed Sunday, September 9, 2001, and agree not to return to work before September 10, 2001.  Id.  Mikesh was required to provide administratively acceptable medical documentation to support three months of her absence.  Id.  Mikesh also had to agree that the absence would constitute her entitlement for time off for this 12-month period under the Family Medical Leave Act.  Id.

Further, the Agency agreed that if Mikesh's performance and conduct, including attendance, between September 10, 2001 and March 8, 2002, was acceptable by the Agency, the Agency would reassign Mikesh to another position to be determined by the Agency at the same grade level (GS-11) within the Minneapolis-St. Paul area.  MSPB Ex. 1-a, Attach 24.  The Agency also agreed that upon Mikesh's return to work on September 10, 2001, the Agency would rescind the March 7, 2001 letter to Mikesh, which imposed additional requirements on Mikesh to have requests for leave approved. Id.  However, the Agency would reinstate the provision of that letter if Mikesh's attendance was deemed not acceptable by the Agency.  Id.

On March 13, 2001, Mikesh responded to the draft Resolution Agreement presented to her on March 12, 2001.  MSPB Ex. 1-a, Attach. 24.  She made comments and suggested changes.  Id.  Mikesh stated that due to her financial situation, she could not take a six-month leave of absence.  Id.  Instead, Mikesh requested 180 hours of advance sick leave, and at end of the advanced sick leave, she requested two weeks of LWOP.  Id.  At the end of that period, Mikesh requested to be put on the donated leave program.  Id.  Mikesh stated that the details of the time expected to be away from the

position were included in Dr. Randy Twito's letter, given to management on March 12, 2001.[6]  Id.

Mikesh stated that she would provide documentation from Dr. Twito on a regular basis regarding her recovery, rehabilitation, and target return date to work.  MSPB Ex. 1-a, Attach. 24.

Mikesh requested that her use of credit hours be reinstated when she returned to work to increase her presence in the office and allow her time for medical appointments, and to build up her annual leave and pay back the sick leave.  MSPB Ex. 1-a, Attach. 24.

Mikesh stated that paragraph 7 of the Resolution Agreement should be deleted in its entirety.[7]  MSPB Ex. 1-a, Attach. 24.  Mikesh also stated that she would not give up her rights to grieve, appeal, or file a complaint before any forum of the substance of the agreement.  Id.  Mikesh indicated that she had not had time to consider the conditions of the Draft Resolution Agreement.  Id.

Further, Mikesh stated that Barbara Milne ("Milne"), Assistant Regional Director for Budget and Administration and Mikesh's second-level supervisor, in the March 12,

---

[6]     On March 5, 2001, Dr. Randy Twito sent a letter addressed "To Whom It May Concern" regarding Mikesh's right shoulder.  ROI Ex. 2, Attach. 13; Mikesh Dec. Ex. B (submitted by Mikesh in connection with summary judgment motion).  Dr. Twito stated that Mikesh had suffered a recurrent tear of her right shoulder in a fall.  Id.  Mikesh needed surgery to repair it and would likely need to be off work for 2-3 months following the repair to rehabilitate the shoulder.  Id.  Mikesh also suffered significant pain in the left shoulder because of "an overuse phenomenon."  Id.  The left shoulder needed to be evaluated with a MRI to rule out similar pathology in the rotator cuff.  Id.

[7]     Paragraph 7 stated: "The Employee acknowledges that the Agency's willingness to enter into this agreement does not constitute an admission of wrongdoing, but rather reflects the Agency's effort to assist the Employee in addressing her medical problems and enhance the quality of her employment and the quality of her life outside of work." MSPB Ex. 1-a, Attach. 24.

2001 meeting in which the draft Resolution Agreement was presented to Mikesh, referred twice to an adversarial relationship between Mikesh and Hartlieb.  MSPB Ex. 1-a, Attach. 24.  Mikesh stated that she had tried to make the relationship between her and Hartlieb amicable and that she resented the implication that she created a situation that prevented a good working environment.  Id.  Mikesh then stated that she could not dispute that her medical condition had necessitated an extreme amount of time way from her job, but asked Milne to consider the fact that there was no current backlog of work in her office due to her absences.  Id.

On March 15, 2001, Hartlieb wrote a letter to Mikesh regarding her request for leave for surgery to repair her injured rotary cuff.  MSPB Ex. 1-a, Attach. 24.  Hartlieb stated that the Agency's goal was to provide Mikesh with adequate time to recover from surgery with the intent of reducing Mikesh's absences upon her return to work.  Id.  The letter also addressed the policies and procedures Mikesh needed to follow for absences from work upon her return to work following the surgery.  Id.

In the March 15, 2001 letter, Hartlieb also informed Mikesh that the letter from Dr. Twito, dated March 5, 2001, was administratively acceptable to support her absence for two months for surgery to repair her rotary cuff.  MSPB Ex. 1-a, Attach. 24.  Mikesh was required to return to work on or before Tuesday, May 29, 2001, at 7:00 a.m.  Id.  Hartlieb denied Mikesh's request for 180 additional hours of advanced sick leave because Mikesh currently had a negative sick leave balance.  Id.  Her absence from March 14, 2001 through May 25, 2001 would be coded as 3.5 hours of credit hours earned and the rest would be coded as LWOP.  Id.  Mikesh was permitted to apply for the leave share program and was approved as a leave share recipient under the leave

share program.  Id.  To the extent leave was donated to Mikesh, the donated leave would be substituted for LWOP taken for the surgery.  Id.

In addition, in the March 15, 2001 letter, Hartlieb rescinded the letter issued to Mikesh dated March 7, 2001.  MSPB Ex. 1-a, Attach. 24.  However, Mikesh was not permitted to earn or use credit hours or flex her work schedule (starting and ending time) until further notice.  Id.  In addition, Hartlieb directed Mikesh, to the extent possible, to schedule medical appointments outside of her regular tour of duty, which was 7:00 a.m. to 3:30 p.m. because she had no available sick leave and a limited amount of available annual leave.  Id.  Hartlieb stated that this process was recommended by Mikesh's husband, John Mikesh, during a March 13, 2001 meeting with Barbara Milne ("Milne"), Assistant Regional Director for Budget and Administration and Mikesh's second-level supervisor.  Id.  Hartlieb also stated that doctor appointments that could not be scheduled outside Mikesh's tour of duty were to be scheduled either first thing in the morning or late in the afternoon to limit her absence from the office.  Id.  Absences for such appointments would not be approved unless Mikesh provided documentation that the appointment could not be made outside her normal working hours.  Id.  Hartlieb would consider the requests for LWOP submitted in advance, on a case-by-case basis.  Id.

Finally, Hartlieb reminded Mikesh in the March 15, 2001 letter that an unapproved absence would result in a charge of AWOL and AWOL was misconduct and could be the basis for disciplinary action up to and including removal from employment.  MSPB Ex. 1-a, Attach. 24.

On April 16, 2001, Mikesh filed an EEO charge.  MSPB Ex. 1-a, Attach. 1.  Milne testified that Mikesh filed the discrimination complaint after Milne sent out an e-mail to the staff asking them not to contact her.  Tr. at 264.  Milne also testified that there were other reasons for the complaint, but she could not recall those reasons.  Tr. at 264.

On May 24, 2001, FWS and Mikesh entered into a Resolution Agreement resolving Mikesh's April 16, 2001, EEO charge.[8]  MSPB Ex. 1-a, Attach. 1.  FWS agreed to place Mikesh on a 7:00 a.m. to 3:00 p.m. work schedule for a 90-day trial period, beginning May 29, 2001, with two exceptions for days she had already scheduled appointments.  Id.  FWS also agreed to locate a vendor who specialized in evaluating work environments and employee interaction to provide team-building sessions for Mikesh and Hartlieb.  Id.  Mikesh agreed that during the 90-day trial period she would schedule non-emergency medical and personal appointments during non-working hours, and provide at least two days notice of her intent to take non-emergency personal time off during scheduled work hours.  Id.  Mikesh also agreed that during the 90-day trial period she would provide doctor's documentation explaining the need for any emergency leave that could not be scheduled in advance during non-working hours. Id.  Lastly, Mikesh agreed to attend on-going team building sessions with Hartlieb for one year.  Id.

---

[8]     Mikesh testified that she signed the Resolution Agreement while under duress, because she was told that if she did not sign the agreement she was threatened, could be dismissed or lose her grade.  Tr. at 55.  According to Mikesh, the Resolution Agreement was not issued to resolve her EEO complaint—it was an idea by management because she did not accept its request that she take off six months LWOP.  According to Mikesh, management wanted to curtail her leave for medical reasons and came up with the Resolution Agreement.  Tr. at 56.

Mikesh testified that after she signed the Resolution Agreement she had to provide documentation for all her leave.  Tr. at 29.  She testified that on one occasions she had a migraine and called her doctor and told her "I cannot go to work.  I need a slip from you.  I just -- I have a terrible migraine and I'm throwing up."  Tr. at 29.  That doctor's note was disapproved.  Tr. at 29.

On July 25, 2001, Milne sent an e-mail to Mikesh regarding her absence on Monday, July 23, 2001.  MSPB Ex. 1-a, Attach. 1.  Milne first reiterated the provisions of the Resolution Agreement that went into effect on May 24, 2001.  Id.  Milne then stated that the note provided from Health Partners for Mikesh's absence on Monday, July 23, 2001, which stated "migraine headache and unable to work 20 medications she used for migraines" was insufficient to justify the absence for the following reasons:

- Since you were not seen by a doctor, it is unclear how a doctor could determine that you were incapacitated from duty.

- The text of that note indicates that you used "20 medications" for migraines.  However, that statement is unclear as to its relevance to your absence, unless it infers you used 20 medications that day, which would seem unlikely and there would be no medical basis to support since you were not seen by a doctor.

- Based on my review of that note, it does not appear to be a "doctor's documentation", as required by the terms of the Resolution Agreement.

MSPB Ex. 1-a, Attach. 1.

Based on the terms of the Resolution Agreement, Milne stated that management expected that the doctor's documentation would provide a medical basis for Mikesh to be absent, as opposed to a note that may be a reiteration of what Mikesh may have told the clinic over the phone.  MSPB Ex. 1-a, Attach. 1.  Milne also explained that to be administratively acceptable, the doctor's documentation must be from a licensed

physician or other appropriate practitioner and provide information that would enable management to make an employment decision, such as the approval of a leave request. Id. Milne further explained that the doctor's documentation should be based on the doctor's findings based on seeing Mikesh or at a minimum, the doctor's conclusions based on the history of Mikesh's medication condition, if any. Id. Milne also stated that the information supporting the doctor's conclusion should be outlined in the doctor's documentation. Id.

Milne then found that Mikesh had not provided acceptable doctor's documentation for her absence from duty for 8-hours on July 23, 2001, and therefore, determined that at that time, leave for that absence was not been approved. MSPB Ex. 1-a, Attach. 1. Milne stated that approval of that absence could be reconsidered if Mikesh provided administratively acceptable doctor's documentation. Id. Milne stated that Mikesh's time and attendance for the pay period would reflect AWOL, unless she provided management with an administratively acceptable doctor's documentation by close of business Friday, July 27, 2001. Id.

On July 16, 2001, Dr. Maureen O'Shea from the Department of Veterans Affairs wrote a letter to Nelson Boggs regarding Mikesh's shoulder. MSPB Ex. 1-a, Attach. 18. Dr. O'Shea stated that Mikesh was currently rated at 100% service connection during her convalescence from rotator cuff repair surgery. Id. On July 13, 2001, Dr. O'Shea conducted a Compensation & Pension evaluation of Mikesh's shoulder and found her to be markedly limited both with regards to range of motion and strength testing in the affected arm and shoulder, and that the level of pain was unacceptably high. Id. Dr.

O'Shea recommended that Mikesh be continued at the 100% level, pending the processing of her application for an increase in her level of service connection.  Id.

On August 2, 2001, Hartlieb received an e-mail from Milne detailing discrepancies in budget reports submitted by Mikesh.  MSPB Ex. 1-a, Attach. 18.  On the same day, Hartlieb forwarded the e-mail to Mikesh and asked her to correct the problems and add items to the budget report.  Id.  Hartlieb stated that there were a lot of inconsistencies in her report and that the report was not complete.  Id.

On August 14, 2001, Mikesh wrote a letter to George Kubic regarding the team building sessions discussed in the Resolution Agreement.  MSPB Ex. 1-a, Attach. 18.  Mikesh stated that she believed the sessions were to be attended by both Hartlieb and herself, but that was not the case that morning and Mikesh did not believe that would be the case in the future.  Id.  According to Mikesh, Hartlieb laid out his job expectations of her and his agenda for the training.  Mikesh stated that she was expected to report to Hartlieb on a bi-weekly basis the progress and results of the "team building."  Id.  Mikesh stated that she believed the team building session disregarded the Resolution Agreement and submitted that the Resolution Agreement was invalid.  Id.

Mikesh then testified that FSW set up a counseling time for Mikesh and Hartlieb.  Tr. at 30.  In that meeting, Mikesh indicated that she wanted to see better working conditions and a good working relationship between her and Hartlieb.  Tr. at 30.  According to Mikesh, the counselor indicated that he would spend time with Mikesh and then she would have to report to Hartlieb how she was improving the working relationship with him and that Hartlieb did not have to change.  Tr. at 30.  Mikesh testified that Hartlieb told her that she needed to change and he did not.  Tr. at 31.

Mikesh also testified that she did not want to quit the sessions, but the sessions were not a "together" team building.  Tr. at 31.

On August 15, 2001, David Gustafson ("Gustafson"), President of National Federation of Federal Employees, Local 14, wrote a letter to William Hartwig, the Regional Director of FWS, on behalf of Mikesh.  MSPB Ex. 1-a, Attach. 1.  Gustafson stated that Mikesh was concerned about the overall success of the team-building program as agreed upon by Mikesh and FWS in the Resolution Agreement that was being conducted by Ed Penney.  Id.  According to Gustafson, during the first session it became apparent that Hartlieb would not have to attend the sessions with Mikesh.  Id.  Gustafson felt that without Hartlieb's participation, the sessions would be of limited value because there would be no mutual agreement of what expectations should be at the end of the program.  Id.  Gustafson requested that Hartlieb attend the sessions.  Id.

On August 15, 2001, Hartlieb placed Mikesh on a Performance Improvement Plan ("PIP").[9]  MSPB Ex. 1-a, Attach. 5.  Mikesh received the PIP on August 20, 2001.

---

[9]     5 C.F.R. § 432.104 provides:

At any time during the performance appraisal cycle that an employee's performance is determined to be unacceptable in one or more critical elements, the agency shall notify the employee of the critical element(s) for which performance is unacceptable and inform the employee of the performance requirement(s) or standard(s) that must be attained in order to demonstrate acceptable performance in his or her position. The agency should also inform the employee that unless his or her performance in the critical element(s) improves to and is sustained at an acceptable level, the employee may be reduced in grade or removed. For each critical element in which the employee's performance is unacceptable, the agency shall afford the employee a reasonable opportunity to demonstrate acceptable performance, commensurate with the duties and responsibilities of the employee's position. As part of the employee's opportunity to demonstrate acceptable performance, the agency shall offer assistance to the employee in improving unacceptable performance.

Id.  In the PIP, Hartlieb stated that Mikesh's performance since June 20, 2001, was rated at a results not-achieved (unacceptable) level.  According to Hartlieb, Mikesh's performance expectations were identified on the DI-2002, Employee Performance Plan and Result Report, on October 19, 2000.  Id.  Since June 18, 2001, meetings had been held on the first and third Monday of every month to monitor the status of the department's financial records and to date, and those records were not accurate or up to date as described in more detail in the PIP.  Id.  Specifically, Mikesh had an unacceptable performance rating in Critical Results C which states: "Manage Division of Engineering budget tracking documents to provide up to date and accurate information to the Regional Engineer and program personnel related to fund status and availability." Id.  Hartlieb then provided several examples of Mikesh's "deficient performance" and detailed how Mikesh could bring her performance rating back up to an acceptable level. Id.

Hartlieb stated that Mikesh needed to notify him as soon as possible before a due date for a project regarding circumstances, if any, that prevented Mikesh from meeting a due date.  MSPB Ex. 1-a, Attach. 5.  Hartlieb also stated that any work product of unacceptable quality (e.g., contains errors, information that is not correct or accurate, etc.), even if submitted by the due date, would not be considered submitted by the due date and would not be viewed as acceptable and complete.  Id.

Hartlieb further stated that if Mikesh believed that personal, medical, or other problems were reasons for her failure to perform duties at an acceptable level, she could contact the Employee Assistance Program or Hartlieb.  MSPB Ex. 1-a, Attach. 5.

---

5 CFR § 432.104.

Hartlieb gave Mikesh until September 28, 2001 to correct her deficient performance.  MSPB Ex. 1-a, Attach. 5.  Hartlieb stated that if Mikesh failed to improve by then or if she exhibited similar deficiencies within one year, an administrative action may be initiated against her, up to and including removal from her employment.  Id.

Finally, Hartlieb informed Mikesh that In order to assist her, Hartlieb would meet with Mikesh to review her performance on a weekly basis, provide timely responses to any questions, problems, or other issues, and consider her requests for assistance to enable her to correct her performance deficiencies.  MSPB Ex. 1-a, Attach. 5.

On August 23, 2001, Milne responded on behalf of Hartwig to Gustafson's letter of August 15, 2001.  MSPB Ex. 1-a, Attach. 5.  According to the Resolution Agreement dated May 24, 2001, FWS retained Penney's services to evaluate the work environment between Mikesh and Hartlieb and to provide team building sessions for them.  Id.  The letter informed Gustafson that Hartlieb was an active participant in the team building process, meeting with Penney on August 14 and 17, 2001, and they had a meeting planned for the future.  Id.  Penney met with Mikesh and Hartlieb at the same time on August 14, 2001, to explain his process for team building, and in that meeting Mikesh was unresponsive.  Id.  In order for Penney to effectively facilitate the team building process, Penney planned to get to know Hartlieb and Mikesh by having separate meetings so he could determine the best method to build up and improve upon their working relationship.  Id.  Once Penney learned each person's needs and expectations, he would then meet with both together on a regular basis.  Id.  The letter then stated that FWS has fulfilled its obligation under the Resolution Agreement to provide and have Hartlieb participate in team building.  Id.  Milne stated that, based on Gustafson's

letter that Mikesh had reconsidered her interest in participation in the team building process, FWS had put Penney's services on hold and needed to know by September 5, 2001, whether Mikesh wished to have Penney proceed with facilitating the team building process with her and Hartlieb.  Milne stated that if she did not hear from Gustafson before September 5, 2001, she would terminate Penney's services.  Id.

On August 29, 2001, Gustafson replied to Milne's August 23, 2001 letter regarding the team building process involving Mikesh and Hartlieb.  MSPB Ex. 1-a, Attach 1.  He stated that he discussed the proposed "team building" process with Mikesh and she was of the belief that the session, if properly orchestrated by Penney, could overcome many of the personality conflicts that exist between her and Hartlieb.  Id.  Gustafson stated that Mikesh did not want to terminate the process and she hoped it would be of a considerable benefit to her, FWS, and Hartlieb.  MSPB Ex. 1-a, Attach 1.

Mikesh testified that she asked for credit hours so she could work on the PIP, but that she was told she could not get the credit hours.  Tr. at 32.  She was told "You get it done any way you want to but you are not changing your work schedule and you are not getting any extra help.  You can get it done and if you don't get it done that's grounds for dismissal or reduction of grade."  Tr. at 32.  Mikesh stated that there was never any leniency for anything.  Tr. at 32.

On August 31, 2001, Hartlieb wrote to presumably Mikesh regarding credit hours and duties.  MSPB Ex. 1-a, Attach 18.  Hartlieb stated that Mikesh failed to follow the guidance in his August 27, 2001 letter to her and his e-mail to her on August 30, 2001.  Id.  Hartlieb stated that if Mikesh determined the expectations outlined in the memorandum and the assignment of regular duties prevented her from performing her

other duties, she was to advise Hartlieb in writing the basis of her determination.  Id.

Hartlieb also indicated that her overtime form 3-136 did not provide sufficient

documentation to determine whether she needed additional time to perform the duties in

her performance letter or new duties.  Id.  Hartlieb also stated that Mikesh's form did not

clearly indicate why the duties could not be performed during normal business hours.

Id.  Hartlieb stated that in order to fulfill her request, he need a list of duties that

currently needed to be performed, due dates, and the amount of time for each duty.  Id.

At the hearing before the MSPB, Mikesh testified that on September 5, 2001,

Carol Fix ("Fix") went to Mikesh's office to find out where the money was for a contract

Fix was working on.  Tr. at 33.  Hartlieb overheard the conversation and invited Fix and

Mikesh into his office.  Tr. at 34.  Mikesh explained where the money was and Hartlieb

yelled at her in front of Fix.  Tr. at 34.  Hartlieb said "Fisheries is not your boss.  Doug

Johnson isn't your boss.  No one is your boss but me and you'll get all your directives

from me and no one else and I don't ever want to hear you get any directive from

anybody else or do something that someone else said."  Tr. at 34.  After Hartlieb yelled

at her, Mikesh broke down.  Tr. at 34.  She called her husband and said "You know, I

need to have you come over here.  I can't make it any longer."  And she crumpled on

the floor.  Tr. at 34.  Mikesh said to Fix, "I'm just going to kill myself and I'm not going to

come back here any more.  I can't live any more."   Tr. at 34.  Mikesh's husband

overheard Mikesh make these statements and then typed a resignation letter.  Tr. at 34.

Mikesh and her husband then walked the letter down to Personnel and handed it in.  Tr.

at 35.  Mikesh testified that nobody explained anything to her.  Tr. at 35.  She handed in

her key to the office and badges, and packed her personal belongings.  Tr. at 35.

Mikesh does not remember what happened the rest of the day or for a couple days after she resigned.  Tr. at 35.  Mikesh saw her psychiatrist on the following Monday and spent three days of that week with her husband at his job.  Tr. at 36.[10]

The letter of resignation stated: "Effective immediately, I resign my position with the Department of the Interior, US Fish and Wildlife Service."  MSPB Ex. 1-a, Attach. 5. Mikesh gave the letter to Rob Morin ("Morin") in the Human Resources Department.  Id. In an affidavit dated September 7, 2001, Morin stated that at approximately 3:55 p.m. on September 5, 2001, Mikesh and her husband  entered his office and Mikesh handed Morin a typewritten letter of resignation, handed over her government credit card, and building badge and stated that she would mail in her keys.  Id.  Morin noted that Mikesh was "visibly upset and her voice was strident as she explained that she was resigning and that she wanted a copy of her file and the original of the blue envelope items in her official file."  Id.  Mikesh's husband said that they "need to take care of this today."  Id. Morin also told Mikesh that her resignation could be effective immediately, but a copy of her file would be sent to her.  Id.

Mikesh also testified that she felt Hartlieb treated her like a second-class citizen. Tr. at 24.  According to Mikesh, when Hartlieb talked to her, he would look at her chest. Id.  He then communicated with her in e-mails and would not talk to her.  Id.  Mikesh did not think Hartlieb understood the budget process.  Id.  Basically, according to Mikesh, she could not do anything right for Hartlieb.  Id.

Mikesh testified that she knew the budget was a mess when she left FWS.  Tr. at 32.  She also stated that she could not keep up with the demands.  Tr. at 32.

---

[10]     Mikesh's husband, Fix, and Hartlieb also testified about these events.  See Tr. at 74-76, 173-174, 180, 204-07, 210-15; ROI Ex. 2, Attach. 8, at 11.

Mikesh testified that she has never attempted to rescind her resignation.  Tr. at 63.  She was not immediately hospitalized after her resignation and did not apply for disability retirement because she did not want her disability to interfere with her retirement.  Tr. at 63.  Mikesh said she did not ask to come back to work because she could not work under Hartlieb and Milne out of fear for her life and reprisal.  Tr. at 65-66.  Mikesh did testify that at one point she had her own business where she worked from home.  Tr. at 64.

Mikesh also submitted an affidavit to the MSPB that she had prepared in connection with the Agency's investigation.  MSPB Ex. 1-a, Attach. 13.  In that affidavit she stated that she was given assignments outside her normal duties.  Id. at 4.  She also stated that Hartlieb and Milne often changed what they wanted from her and often gave her a "moving target" to complete.  Id.

Several FWS employees testified at the MSPB hearing, including Steve Gorg, John Ramsour, Carol Johnson, Steve Dedon, Carol Fix, Hartlieb, Terry Pennaz, Patrick McDermott, and Milne.  The Court is satisfied that the AJ properly summarized the witness testimony of Johnson, Dedon, Fix, Hartlieb, Pennz, McDermott and Milne as follows:

> Several employees, including Civil Engineer Carol Fix and Electrical Technician Steve Dedon, testified that the appellant had been a good, conscientious worker under prior supervisors, but could not seem to do anything right for Mr. Hartlieb.  According to Ms. Fix, Mr. Hartlieb appeared to be constantly upset with appellant.  And Safety, Health, and Environmental Compliance Manager Patrick McDermott testified that a number of times when Mr. Hartlieb raised his voice to the appellant, his complaints were unfounded.  Some employees, such as Mr. Dedon, testified that Mr. Hartlieb became "negatively aggressive" with the appellant after February 2001 in an apparent attempt to damage her mental and emotional state.  Mr. Dedon testified that he saw Mr. Hartlieb grill the appellant in detail about work she had recently accomplished and

berate her because the financial accounts were not up to date.  Ms. Fix testified that Mr. Hartlieb became angry with the appellant while giving her instructions on one occasion after she asked to tape record his instructions because he kept changing his mind.  According to Mr. Dedon, the appellant was very distraught and emotional during her last few months at work.  The appellant testified that she considered suicide in February 2001 because of the unbearable pressure working for Mr. Hartlieb.

Other employee, most notably Supervisory General Engineer Terry Pennaz, testified that even though Mr. Hartlieb was hard on the appellant and had many heated discussions with her when she did not do things fast enough to suit him, Mr. Hartlieb treated the appellant no differently than other employees.  According to Mr. Pennaz, Mr. Hartlieb harassed and threatened everybody in the office.

Several witnesses also described problems with the appellant's work performance.  For example, Budget Analyst Carol Johnson, who had worked in the finance section and exercised final approval on payments submitted by the appellant, testified that the packages provided by the appellant were generally incomplete and required more documentation before payments could be approved.  The agency's Administrative Officer, Barbara Milne, testified that in June 2001, she found deficiencies in three financial reports prepared by the appellant, explaining that some accounts were missing, salaries were not tracked accurately, and balances did not match.  As a result, Ms. Milne met with the appellant every couple weeks to review, line by line, the Engineering Division's budget and tell the appellant what she had to do to correct the deficiencies.  According to Ms. Milne, the appellant had difficulty grasping concepts and her financial reports still had problems.  Ms. Milne testified that the reports contained common errors that should have been caught in a review, and the records looked like the appellant had not made the correct adjustments.  Ms. Milne testified that the continuing problems with the appellant's financial records, including her failure to reconcile negative balances shown in project accounts, led the agency to place the appellant in a performance improvement period (PIP).

* * *

When she testified at the hearing in this appeal, the appellant admitted that the budget records were a "mess" when she resigned on September 5, 2001.  She testified that she could not keep up with the work and get everything done.  The appellant also contends she could not complete the tasks required by the PIP notice within the time provided.  But the former Regional Engineer, John Ramsour who retired in 1995, testified that most of the deficiencies listed in the PIP notice could have been corrected in the

time afforded by the PIP notice with appropriate guidance from the Regional Engineer.

Carol Johnson assumed the duties of Budget Analyst for the Engineering Division immediately after the appellant resigned.  Ms. Johnson testified that the files were not in good shape at that time.  According to Ms. Johnson, lots of documents were missing from files, and the appellant had made a lot of errors and omissions in the financial records.  In addition, Ms. Johnson could not determine when the Engineering Division's budget was last reconciled with the monthly reports issued by the Federal Financial System.  In fact, Ms. Johnson testified that there was no evidence these records had been reconciled during the entire fiscal year, stretching back to October 2000 (which was also two months before Hartlieb became the Regional Engineer).  Ms. Johnson testified that the monthly reports did not reflect accurate account balances because the appellant did not charge expenses to proper cost codes.  Ms. Johnson explained that the records indicated the appellant simply charged all expenses to a single account until the account was depleted and moved on to the next account.  According to Ms. Johnson, many of the project accounts had been depleted by payments that should have come from other accounts.  Ms. Johnson testified that it took 6 to 9 months to clean up the financial records maintained by the appellant.  Ms. Johnson further testified that she was never able to reconcile approximately one quarter of the project accounts in the Engineering Division's budget.

* * *

Mr. Hartlieb testified that the appellant was placed on a PIP because the project accounts in the Engineering Division's budget were $500,000 in the red by August 2001 and could not get straightened out.  The appellant claimed Mr. Hartlieb did not understand that changes in the Engineering Division's budget took one month to work their way through the system and appear in the reports issued by the Federal Financial System.  Although Mr. Hartlieb acknowledged that some changes may take time to work their way through the system, he testified without contradiction that the $500,000 discrepancy had appeared for approximately four consecutive months, even though the appellant's reports showed the project account balances were fine.  Ms. Johnson testified that the FFS system was not the source of the problem.

MSPB Ex. 1-a, Attach 26, at 5-9; Tr. 110-120, 124-147, 150-158, 165-186, 188-215, 224-238, 244-248, 250-273.

Steve Gorg testified that he was fired four hours after filing a workman compensation claim.  Tr. at 90-91.  He also testified that employees with health issues were issued leave restriction letters or were asked to provide extensive amounts of documentation when taking leave even though the absence was due to surgery or other illnesses.  Tr. at 93.  Overall, Gorg testified that he found the work environment at FWS to be very hostile, people were afraid to take sick leave, and if he were in Mikesh's situation he would have been a "very, very distraught unhappy person."  Tr. at 94, 102.

At the hearing, Hartlieb also testified that Milne gave him a list of people that she considered problem people.  Tr. at 200.  One person was Mikesh because of her leave usage.  Tr. at 200.

The Affidavits of Terry Pennaz, Mikesh's co-worker, and Milne are also part of the MSPB record.  Pennaz indicated in his affidavit that Mikesh requested and received accommodations for her handicaps—a sunlamp, computer modifications, and she was permitted to work at home under a flexiplace program for a period of time.  MSPB Ex. 1-a, Attach. 19, at 2.   Pennaz stated that Hartlieb communicated with Mikesh in a threatening manner and would harass her, but then stated that Hartlieb communicated with Mikesh as he did with other employees.  Id. at 4.  Pennaz characterized the work environment as hostile, but would not quit because of it.  Id. at 4-5.  Pennaz did not believe Mikesh's sex, mental or physical handicaps, or her prior EEO activity were factors in the alleged discrimination against Mikesh.  Ex. 1-a, Attach. 19, at 7.  In Pennaz's opinion, Mikesh was capable of performing her job, but because she is an emotional person, she could not handle Hartlieb's harassment and threatening behavior.  Ex. 1-a, Attach. 19, at 7.  Pennaz did not believe Hartlieb treated her any

different than the other employees, but she could not deal with it.  Ex. 1-a, Attach. 19, at 7.

Milne acknowledged in her affidavit that she was aware that Mikesh had health issues, but not that she had any physical or mental handicaps.  MSPB Ex. 1-a, Attach. 19, at 2-3.  In Milne's opinion, Hartlieb communicated and interacted the same with Mikesh as with other employees.  Id.  Milne stated that Mikesh's sex, physical and mental handicaps, and prior EEO activity were not factors in the alleged discrimination against Mikesh.  Id. at 6.  Milne considered Hartlieb a strict manager, but not hostile.  Id. at 7.

On September 10, 2001, following Mikesh's resignation, Dr. Barbara Vize wrote a letter entitled "To Whom It May Concern" regarding Mikesh's depression.  MSPB Ex. 1-a, Attach. 18.  Dr. Vize stated that Mikesh had been a patient of hers since July 2001, but Mikesh had been a patient of HealthPartners for much longer.  Id.  Dr. Vize reviewed Mikesh's chart from January 2000 to present.  Id.  Dr. Vize stated that Mikesh was being treated for depression and migraines and had been treated with multiple medications for her depression.  According to Dr. Vize, Mikesh had also been treated by psychiatry and had been referred there.  Id.

Dr. Vize stated that depression and the medications used to treat it (Zoloft, Paxil, or Celexa) affected Mikesh's ability to function daily at her job—affecting her concentration, stamina, reasoning, focus, organize, and formulate plans.  MSPB Ex. 1-a, Attach. 18.  Mikesh reported that the side effects included trouble waking up in the morning, feeling foggy until the early afternoon, and having difficulty with simple tasks.  Id.

Dr. Vize stated that Mikesh's depression is exacerbated by stress at work. MSPB Ex. 1-a, Attach. 18.  Dr. Vize stated that reasonable accommodations should be made in her work environment to accommodate her situation.  Id.  According to Dr. Vize, accommodations included clear communication about job responsibilities and adequate time to fulfill her job responsibilities.  Id.  Dr. Vize stated that Mikesh's ability to cope with stress and function are affected by her medication and changes in medication necessary to control her symptoms.  Dr. Vize did not know how long the condition would last.  Id.

At the hearing, Mikesh also submitted letters from Linda Stevens, Sandra Sloss, and James Kelly.  MSPB Ex. 1-a, Attach. 18.  James Kelly, former chief of the Division of Engineering, stated that he found Mikesh to be a dedicated and competent employee, and commented on the FWS financial system, Mikesh's job performance, and Mikesh's absences while he was her supervisor.  Id.  Linda Stevens, Budget Analyst for Region 6, stated that Mikesh shadowed her for one week to learn the budget tracking system.  Id.  Stevens stated that Mikesh was energetic, personable, and quick to grasp concepts.  Id.  Stevens also stated that Mikesh helped set up the first Engineering Budget Analyst workshop where she demonstrated the budget tracking system.  Id.  Sandra Sloss, Program Analyst, stated that she has great respect for Mikesh, Mikesh has always provided the information she needed to address problems with Mikesh's region, and that Mikesh has been an asset to her and other analysts in the region.  Id.

### 2.   Issues Considered by the Agency and MSPB and the Reasoning for Each Decision

#### a.   The Agency Decision

The Agency considered Mikesh's allegations that she was discriminated against on the basis of sex (female), physical disability (impaired/limited mobility-back, knees, neck), mental disability (clinical depression), and reprisal for "previous EEO activity most recent to this complaint on May 22, 2001 involving a settlement agreement to resolve credit/flex time and leave issues against management" when:

1.    Her supervisor denied her a reasonable accommodation by refusing to allow her to adjust her work hours (via flex hours and credit hours) to get her medical treatments between August 29, 2001 through September 5, 2001.

2,    She was subjected to a hostile work environment (continual harassment) based on sex, disability, and reprisal.

3,    On September 5, 2001, after her supervisor embarrassed and yelled at her in the presence of her co-worker, she was forced to resign (constructive discharge) from her position as Budget Analyst, GS-560-11.

MSPB Ex. 1-a, Attach. 1, FAD at 2.

On March 25, 2003, the Department of the Interior ("Agency") determined that that Mikesh's "choice to resign did not rise to the level of constructive discharge" and that Mikesh "was not discriminated against based on sex, disability, and reprisal." MSPB Ex. 1-a, Attach. 1, FAD, at 15.

As to Mikesh's prima facie case of discrimination based on sex, the Agency determined that Mikesh had shown that she is female and therefore a member of a protected class, but failed to establish an inference of discrimination based on sex. MSPB Ex. 1-a, Attach. 1, FAD, at 8.

As to Mikesh's prima facie case of discrimination based on disability, the Agency found that Mikesh was a qualified individual with a disability, both physical and mental.

MSPB Ex. 1-a, Attach. 1, FAD, at 8.  The Agency then found that Mikesh failed to show that she was subject to adverse action as a result of being denied reasonable accommodations to perform the essential functions of her job in light to her disabilities. Id.  In this regard, the Agency specifically found that Mikesh had failed to present any evidence that she ever requested or was denied reasonable accommodations.  Id., at 8-9.  In addition, the Agency found that Mikesh had not shown that her disabilities had adversely impacted her ability to manage the budget or to perform the duties of Critical Element C which was the subject of her PIP ("manage Division of Engineering budget tracking documents to provide up to date and accurate information to the Regional Engineer and program personnel related to fund status and availability.")  Id. at 9.

As to being denied credit hours or flex time in retaliation for her making an EEO complaint, the Agency found that Mikesh failed to establish an "inference of discrimination based on sex and disability, but did establish an inference of discrimination based on reprisal.  MSPB Ex. 1-a, Attach. 1, FAD, at 9.  The Agency then found that Mikesh had made out a prima facie case of reprisal as she had been subjected to an adverse action by being denied credit hours or flex time from August 29, 2001, through September 5, 2001, even though she was allowed credit hours and flex time for a 90-day time period from May 24, 2001, through August 22, 2001, pursuant to the May 24, 2001 Resolution Agreement.  Id. at 9-10.[11]  Specifically, the Agency found that the record indicated that Mikesh engaged in prior EEO activity on May 24, 2001, when she signed the settlement agreement, and that Hartlieb and Milne were aware of

---

[11]     However, the Agency also found that Mikesh had failed to show that she was treated differently from persons outside of her protected groups.  MSPB Ex. 2, FAD, at 9.

Mikesh's prior EEO activity.  Id. at 10.  Based on this information, the Agency found that the denial of credit hours and flex time in August through September 2001 created a nexus with the EEO activity of May 2001.  Id. at 10.

The Agency then turned to management to articulate legitimate, nondiscriminatory reasons for the challenged actions.  MSPB Ex. 1-a, Attach. 1, FAD, at 10.  Hartlieb stated that credit hours and flex time privileges were taken away from Mikesh after the time period set forth in the Settlement Agreement because Mikesh had "continued to be guilty of taking periods of excessive unanticipated leave . . . which resulted in her having a negative leave balance and because Hartlieb believed that Mikesh should have worked less hours rather than being granted credit hours because each time Mikesh tried to work more hours to accumulate credit hours, she seemed to become ill which required her to take more leave than she had or could accumulate.  Id. at 10.  Based on this evidence, the Agency concluded that management's reasons were not a pretext.  Id. at 10.  In this regard, the Agency stated:

> Management's denial of credit hours/flex schedule cannot be viewed as reprisal for her informal settlement because the denial was based on a continuation of [Mikesh's] behavior regarding her absenteeism that started long ago.  The denial of the August 29-September 5, 2001 request was simply because the terms of the settlement agreement had ended and it was not extended beyond that time frame. . . . [I]t was [Mikesh's] continued absenteeism and negative leave balance that management based its decision on, not her protected activity."

MSPB Ex. 1-a, Attach. 1, FAD, at 11.

The Agency also ruled on Mikesh's claim of hostile work environment.  MSPB Ex. 1-a, Attach. 1, FAD, at 11.  The Agency found that Mikesh "was not subjected to a hostile work environment" in reprisal for her activities because she failed to show "that she was subjected to severe and pervasive harassment in the work place which created

intolerable working conditions."  MSPB Ex. 1-a, Attach. 1, FAD, at 12.  In this regard, the Agency found that the record did not establish that Mikesh encountered any barriers by being denied leave donation, Mikesh was never charged with LWOP or AWOL from August 29, 2001 through September 5, 2001, and Hartlieb did not single out Mikesh to harass her.  Id. at 12-14.

The Agency based this decision on the following reasoning.  The record showed no evidence that Mikesh encountered any barriers by being denied leave donation, but the record did show that she was provided leave donation for her medical needs, despite the fact that she had taken all of her sick and annual leave and had a negative leave balance.  As to the change of schedule issue, Milne testified that Mikesh submitted a change in work schedule and the request was approved on four different occasions, in accordance with the terms of the May 2001 Resolution Agreement. Further, the record showed that Mikesh was never placed on WLOP or AWOL from August 29, 2001, through September 5, 2001.  MSPB Ex. 1-a, Attach. 1, FAD, at 12.

As to being repeatedly humiliated in the presence of co-workers by Hartlieb's verbal assaults and his yelling at her, several of Mikesh's co-workers (Michael McFadden, Terry Pennaz, and Carol Fix) stated that they personally witnessed such incidents, but added that Hartlieb routinely treated all his employees in that manner, which indicated that Mikesh was not being singled out.  MSPB Ex. 1-a, Attach. 1, FAD, at 12-13.

Further, Hartlieb denied that he only communicated with Mikesh in e-mail, communicating with her verbally and in writing because she had a tendency to forget things.  The Agency found that Mikesh did not provide any evidence to dispute this

claim, but indicated that it was Hartlieb who was forgetful. Hartlieb also denied assigning Mikesh menial tasks, but stated that on occasion he would ask her to assist him with his computer because he was not familiar with the computer system. Hartlieb also asked Pennaz, as GS-13 employee, to do the same. MSPB Ex. 1-a, Attach. 1, FAD, at 13.

In summary, the Agency found with respect to Mikesh's hostile work environment claim:

> None of the incidents she identified, neither singularly nor collectively, rise to the level of being servere and pervasive conduct by Mr. Hartlieb. While the Complainant raised some issues of concern about Mr. Hartlieb's personality, demeaning tone and occasional yelling, we find that none were acts directed at her to single her out for harassment. Other employees stated that they were beneficiaries of Mr. Hartlieb's rudeness, humiliating and demeaning tone of communication as well. This conduct by Mr. Hartlieb demonstrate [sic] poor management/supervisory skills but not discrimination. Furthermore, as indicated earlier, the Complainant has not shown that any of the incidents were related to her sex, disability or reprisal.

MSPB Ex. 1-a, Attach. 1, FAD, at 14.

Finally, the Agency ruled on Mikesh's allegation of constructive discharge. After laying out the elements for constructive discharge,[12] the Agency found that Mikesh had failed to show that she was singled out and placed under adverse working conditions that a reasonable person would find intolerable. MSPB Ex. 1-a, Attach. 1, FAD, at 14. The Agency reasoned that while Mikesh was yelled at by Hartlieb about her

---

[12] Citing to Simon v. United States Postal Service, 91 FEOR 3119, September 27, 1989, the Agency stated that "[a] complainant alleging constructive discharge must show that: 1) the employer subjected the employee to working conditions that a reasonable person in the employee's position would find intolerable; 2) discriminatory conduct created the intolerable working conditions; and 3) the employee resigned involuntarily as a result of the intolerable working conditions." MSPB Ex. 1-a, Attach. 1, FAD, at 14.

performance, so were other employees, but they did not resign.   The Agency further found that the "record is devoid of any evidence that a pattern of harassive or disciplinary actions were aimed at [Mikesh] for the purpose of forcing her to resign because of her sex, disability or reprisal."  Id. at 15.

          b.    The MSPB Decision

Upon receipt of the adverse decision by the Agency, Mikesh appealed the decision to the MSPB.   The following claims were accepted for processing by the MSPB:

> You believe you were discriminated against on the bases of sex (Female), physical handicap (Impaired/Limited Mobility—back, knees, neck), mental handicap (Clinical Depression) and reprisal when:

> 1.    Your supervisor denied you a reasonable accommodation by refusing to allow you to adjust your work hours (via flex hours and credit hours) to get your medical treatments. (On-going)

> 2.    You were subjected to a hostile work environment when:

>> a.    You encountered barriers when trying to get medical assistance;
>> b.    You were placed on LWOP and AWOL;
>> c.    You were yelled at and embarrassed;
>> d.    You were humiliated repeatedly in the presence of co-workers;
>> e.    While on medical leave for surgery, your supervisor contacted you with questions regarding the budget and budget process;
>> f.    The Assistant Regional Director—Budget and Administration (ARD-BA) circulated a memorandum to the effect that you were not to be contacted at home;
>> g.    You were treated differently than your co-workers when your supervisor spoke to other staff members, while he refused to speak with you unless he was forced to or communicated through the ARD-BA; (On-going) and,
>> h.    You believe that during the period from mid November 2000 to September 5, 2001, your supervisor continually discriminated against you, when he expected you to perform

menial and subservient duties that were performed by his
male administrative assistant, in his former position.

3.     On September 5, 2001, after your supervisor yelled at you in the
presence of your co-worker, you were forced to resign
(constructively discharged) from your position as Budget Analyst
GS-0560-11.

MSPB Ex. 1-a, Attach. 1.

On August 23, 2003, the MSPB issued its decision.  The MSPB concluded that

Mikesh had failed to prove her resignation was involuntary, and therefore dismissed her

appeal for lack of jurisdiction.  MSPB Ex. 1-a, Attach. 26, at 2, 13.

In reaching this conclusion, the MSPB stated that Mikesh's main claim of

coercion was that she was under stress because her supervisor, Hartlieb, frequently

criticized her performance and placed her under a PIP.  MSPB Ex. 1-a, Attach. 26, at

11.  The MSPB observed that Hartlieb treated everybody badly, yet no other employee

resigned.  Id.  The MSBP also found that Mikesh was never asked to resign or was

physically threatened by Hartlieb or any other employee.  Id.  The MSPB found that to

the extent that Hartleib did criticize Mikesh, he focused on her work performance and

her performance did warrant criticism.  Id. at 8, 11-12 (citing to testimony of Mikesh's

replacement, Carol Johnson, who testified regarding numerous problems with financial

records maintained by Mikesh and that it took her 6 to 9 months to clean up the records,

and Mikesh's own testimony that the financial record were a mess when she resigned).

In summary, the Board stated:

The evidence indicates the appellant was simply too sensitive to deal with
the criticism she received from Mr. Hartlieb and his apparently rude
expressions of frustration with the quality of her performance.  Supervisory
General Engineer Terry Pennaz testified that Mr. Hartlieb treated the
appellant no different than the other employees.  In addition, Mr. Pennaz
explained that the appellant was too emotional and sensitive to handle Mr.

Hartlieb's harassing and threatening demeanor.  (See also Agency Exhibit 3, affidavit of Terry Pennaz).

\* \* \*

Consequently, even though the appellant emotionally collapsed on September 5, a reasonable person would not have felt compelled to resign after receiving Mr. Hartlieb's criticism that day for transferring funds without his authority.  At that point, the appellant was only about half way through her performance improvement period.  In addition, the agency had not formally proposed any adverse action, such as separation from employment, based on unacceptable performance.  Where an agency is only considering initiating disciplinary or corrective action at the time an employee resigns, the employee must make a particularly strong showing to establish impropriety by the agency.  See Dorrall v. Department of the Navy, 301 F.3d 1375, 1380-81 (Fed. Cir. 2002).

An employee is not guaranteed a work environment free of stress.  See Miller v. Department of Defense, 85 M.S.P.R. 310, 322 (2000). Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are generally not so intolerable as to compel a reasonable person to resign.  See Miller, 85 M.S.P.R. at 322.  Moreover, superiors are within their rights to confront employees about problems in their performance; and an agency has the authority to place an employee on a performance improvement plan with a warning that failure to improve could lead to separation from employment. See 5 U.S.C.A. § 4303 (West 1996); 5 C.F.R. § 432.104 (2003).  The doctrine of coercive involuntariness is narrow and does not apply to a case in which an employee decides to resign because she does not want to accept measures that an agency is authorized to adopt, even if those measures make continuation in the job so unpleasant she feels the only realistic option is leaving.  See Terban v. Department of Energy, 216 F.3d 1021, 1025 (Fed. Cir. 2000); Staats v. United States Postal Service, 99 F.3d 1120, 1124 (Fed. Cir. 1996).  Thus, the agency's decision to place the appellant on a PIP and criticize the quality of her work performance does not constitute the type of improper act that could support a claim that working conditions were intolerable.  See Schultz v. United States Navy, 810 F.2d 1133, 1136 (Fed. Cir. 1987) (threat of removal for cause did not render resignation involuntary).

The appellant had the option of completing the performance improvement plan and challenging any corrective action that might ensue therefrom. Thus, the appellant had an option to resigning.  Because the appellant has not shown that a reasonable person would have believed she had no option but to resign, I conclude the appellant failed to prove her resignation was involuntary.  Cf. Terban v. Department of Energy, 216

F.3d 1021, 1025 (Fed. Cir. 2000) (verbal confrontation with supervisor and assignment to two menial tasks).   Consequently, the Board has no jurisdiction over this appeal.  See Heining, 68 M.S.P.R. at 519; Bravman, 26 M.S.P.R. at 171.

Id. at 12-14.

### 3.      Analysis of MSPB Decision

As stated previously,  pursuant to 5 U.S.C. § 7703(c), this Court's decision on defendant's motion for summary judgment on Mikesh's appeal of the MSPB decision is limited to a  review of the administrative record, and the decision must be affirmed unless it was arbitrary, capricious, an abuse of discretion, procedurally infirm, or not supported by substantial evidence.  Mason, 32 F.3d at 318; Crawford, 37 F.3d at 1340-41.  In addition, the Federal Circuit "has held that a party in an MSPB proceeding must raise an issue before the administrative judge if the issue is to be preserved for review in this court."  Warren v. U.S. Postal Service, 147 Fed. Appx. 969, 974 (Fed. Cir. 2005) (citing Bosley v. Merit Sys. Prot. Bd., 162 F.3d 665, 668 (Fed. Cir. 1998).  See also, Christie v. United States, 518 F.2d 584, 587 (1975) ("This Court, under the doctrine of exhaustion  of  administrative  remedies,  must  restrict  its  review  to  the  factual  matters presented below." (citation omitted)).

Mikesh contends that defendant's motion for summary judgment should be denied because the MSPB decision was not made in accordance with the law.  Mikesh presented two grounds in support of her opposition.  First, she argued that the ALJ erred in holding Mikesh to the standard of a "reasonable person" that did not take into account her particular situation and condition—i.e. "a suicidal, or potentially suicidal, person  with  a  long  history  of  depression,  intentionally  subjected  to  escalating,

venomous criticism and burdens because of her absence due to her disabling conditions." Def.'s Mem. at 19.

Second, Mikesh contended that because of her mental and emotional condition, she was not competent to resign. Def.'s Mem. at 1. According to Mikesh, acceptance of her resignation by the Agency was improper if it had substantial information casting doubt on her mental capacity. Id. at 16.

This Court will address Mikesh's latter argument first. As Mikesh correctly observed, "[t]he MSPB did not determine whether [she] was competent to resign on September 5, 2001." Def.'s Mem. at 17, n.5. However, from a review of the record and the issues presented to the MSPB for consideration (see Section II.A.2.b, supra), Mikesh did not present for consideration her theory that she was not competent to resign to the MSPB.[13] Therefore, this Court is precluded from considering this argument as a reason to overturn the MSPB decision. See Warren, 147 Fed. Appx. at 974.

The Court will now turn to Mikesh's contention that the MSPB's determination that her resignation was not involuntary was not in accordance with the law.

A decision to resign or retire is presumed to be voluntary. Christie v. United States, 518 F.2d 584, 587 (1975). Consequently, employees who voluntarily resign or retire have no right to appeal to MSPB. Shoaf v. Dep't of Agric., 260 F.3d 1336, 1340-41 (Fed. Cir. 2001).[14]

---

[13]    Similarly, Mikesh did not raise her competency to resign to the Agency. See Section II.A.2.a, supra.

[14]    The Federal Circuit has recognized that the MSPB's jurisdiction and the merits of an alleged involuntary separation are "inextricably intertwined." Schultz v. United States Navy, 810 F.2d 1133, 1136 (Fed. Cir. 1987); Dumas v. Merit Sys. Prot. Bd., 789 F.2d

Here, Mikesh alleged that FWS coerced her to involuntarily resign by creating working conditions so intolerable that she was driven to quit.  To rebut the presumption of voluntariness where, as here, there are no allegations of deception or misinformation by the agency, the employee must prove that the resignation or retirement was the product of coercion by the agency." Cox v. Dep't of Navy, 34 Fed. Appx. 782, 784 (Fed. Cir. 2002).  "As a general proposition, to establish involuntariness on the basis of coercion this court requires an employee to show: (1) the agency effectively imposed the terms of the employee's resignation or retirement; (2) the employee had no realistic alternative but to resign or retire; and (3) the employee's resignation or retirement was the result of improper acts by the agency." Shoaf, 260 F.3d at 1341 (citing Christie, 518 F.2d at 587; Staats v. United States Postal Serv., 99 F.3d 1120, 1124 (Fed. Cir. 1996)). Ultimately, the Court must consider "whether working conditions were made so intolerable by the agency that a reasonable person in the employee's position would have felt compelled to resign." Shoaf, 260 F.3d at 1341; Scharf v. Dept. of the Air Force, 710 F.2d 1572, 1574 (Fed. Cir. 1983) ("[F]reedom of choice [is] the guiding principle [in an involuntariness determination].");  Braun v. Dept. of Veterans Affairs, 50 F.3d 1005, 1007-08 (Fed. Cir. 1995) ("To determine whether a resignation or retirement is voluntary, a court must examine 'the surrounding circumstances to test the ability of the employee to exercise free choice.'" (citations omitted)).

The Court applies an objective standard when considering whether an employee involuntarily resigned or retired.  "This test is an objective, rather than subjective one;

---

892, 894 (Fed. Cir. 1986). If it is established that a resignation is involuntary, the MSPB has jurisdiction and the employee wins on the merits and is entitled to reinstatement. Schultz, 810 F.2d at 1136.

the employee's subjective feelings are irrelevant.   The employee must present allegations of fact, which, if proven, establish that a reasonable employee confronted with the same circumstance would feel coerced into resigning." Middleton v. Dep't of Defense, 185 F.3d 1374, 1379 (Fed. Cir. 1999).   To objectively determine whether a reasonable person in the employee's position would have felt compelled to resign, a deciding tribunal must consider the totality of the circumstances. Shoaf, 260 F.3d at 1341 (citing Perlman v. United States, 490 F.2d 928, 933 (1974) ("This court has consistently examined the surrounding circumstances to test the ability of the employee to exercise free choice.")).   However, "[I]n determining whether an alleged act of coercion caused an employee's involuntary retirement, a court need not limit itself to any particular time frame." Terban v. Dep't of Energy, 216 F.3d 1021, 1024 (Fed. Cir. 2000).

This Court finds that the MSPB's conclusion that Mikesh's resignation was not involuntary, was neither arbitrary, capricious, an abuse of discretion, procedurally infirm, nor lacking the support of substantial evidence.   Therefore, the Court recommends that FWS's motion for summary judgment be granted on this issue.   The Court reaches this conclusion for two reasons:

First, contrary to Mikesh's contention that the MSPB applied the wrong reasonable person standard, this Court finds that the MSPB applied the standard dictated by the law. See MSPB Ex. 1-a, Attach. 26, at 2-3.   In essence, Mikesh argued that the MSPB should have made a determination on whether her decision was voluntary or involuntary based on what a reasonable person who had suffered from depression and was suicidal would have done. See Pl.'s Mem. at 17-19.   In support of

this position, Mikesh cited to <u>Heining v. General Services Admin.</u>, 68 M.S.P.R. 513 (1995), which states:

> The fact that other employees found the working conditions unpleasant supports Ms. Heining's allegation of unpleasant working conditions. However, this fact has no relevance to Ms. Heining's case of involuntary resignation. There is no evidence that others in her unit were whistleblowers who were subjected to the same retaliatory actions as Ms. Heining. Thus, other employees in her unit cannot represent the "reasonable employee" "in the same shoes" as the appellant.

<u>Id.</u> at 523 n.4.

Based on this footnote, Mikesh argued that the MSPB improperly compared her to others in her department who did not quit, despite Hartlieb's maltreatment of them. According to Mikesh, the determination of the reasonable person should be based on a person in her condition—<u>i.e.</u> a person who is suicidal and suffering from long-standing depression.

A review of <u>Heining</u> does not lead this Court to the conclusion advanced by Mikesh. At best, the <u>Heining</u> stands for the proposition that Mikesh should have been compared to other employees in her department who, like her, had filed an EEO claim and then had experienced the same type of treatment that she claims Hartlieb brought to bear on her. Mikesh has not cited, and the Court cannot find, any cases that stand for the proposition that the "reasonable person" determination is first dictated by the mental or physical condition of the claimant, and then asks whether a person suffering from that condition would react to the alleged situation the same way as the claimant did. To the contrary, every case this Court has found focuses on the external circumstances to which the employee was subjected, and then asks the question whether a reasonable person confronted with the same set of circumstances would

have felt forced to quit.  See e.g. Cox, 34 Fed.Appx. at 784 ("Coercion sufficient to demonstrate that retirement was involuntary requires a showing that 'working conditions were made so intolerable by the agency that a reasonable person in the employee's position would have felt compelled to resign.'" (citation omitted)); Schoaf, 260 F.3d at 1341 ("[A] reviewing tribunal should ultimately consider whether working conditions were made so intolerable by the agency that a reasonable person in the employee's position would have felt compelled to resign."); Middleton, 185 F.3d at 1379 ("The employee must present allegations of fact, which, if proven, establish that a reasonable employee confronted with the same circumstance would feel coerced into resigning."); Braun, 50 F.3d 1007-08 ("To determine whether a resignation or retirement is voluntary, a court must examine 'the surrounding circumstances to test the ability of the employee to exercise free choice.'" (citations omitted)); Christie, 518 F.2d at 587 ("Duress is not measured by the employee's subjective evaluation of a situation.  Rather the test is an objective one." (citation omitted));  Jones v Dept. of Navy, 66 M.S.P.R. 421, 423-24 (1995) ("The ultimate question to be decided . . .  is whether working conditions were so difficult that a reasonable person in the employee's position would have felt compelled to resign." (citation omitted)).  Therefore, this Court finds that the MSPB applied the appropriate objective standard—considering the totality of the circumstances, whether a reasonable person in her position would have felt compelled to resign.  MSPB Ex. 1-a, Attach. 26, at 2-3.[15]

---

[15]    Mikesh also cited to Swift v. USPS, 61 MSPR 29, 32-33 (1994), for the proposition that depression has been held to justify a finding of involuntary resignation.  Pl.'s Mem. at 16.  However, that is not the holding of the case.  The issue is Swift was whether the AJ had properly refused Swift's request for a hearing to submit evidence regarding his claim that his resignation was involuntary.  Like Mikesh, Swift claimed that

Second, based on the "totality of the circumstances" this Court finds that the MSPB's decision that Mikesh's resignation was voluntary was supported by substantial evidence and was not an error of law.  Mikesh has not established that her resignation was involuntary based on coercion because she has not shown that FWS effectively imposed the terms of her resignation, that she had no realistic alternative but to resign, and that her resignation was the result of improper acts by the Agency.

As an initial matter, it is undisputed that FWS never asked Mikesh to resign.  Tr. at 216.  Further, while it is true that FWS presented Mikesh with a PIP, "[w]here an employee is faced merely with the unpleasant alternatives of resigning or being subject to removal for cause, such limited choices do not make the resulting resignation an involuntary act."  Schultz v. United States Navy, 810 F.2d 1133, 1136 (Fed. Cir. 1987).  In addition, there is evidence to suggest that Mikesh had an alternative to resignation— she could have finished her PIP and challenged any action that resulted.  Alternatively, she could have complained to the Agency regarding Hartlieb's treatment of her, and given them an opportunity to remedy it before she took the drastic measure of quitting.

Further, the evidence shows that while Hartlieb yelled at Mikesh and criticized her performance, the evidence also supports the Board's conclusion that Hartlieb treated Mikesh no differently than other employees or that his criticism of her work was

---

he suffered from depression and that the harassment he had experienced on the job, and his supervisor's refusal to reassign him to a less stressful situation, forced him to resign.  The MSPB found that Swift's contentions, coupled with his supporting medical evidence, was sufficient to constitute a nonfrivolous allegation of involuntariness, and accordingly, Swift was entitled to a hearing.  Swift, 61 MSPR at 33.  The Board then remanded the case for a hearing on the issue of the voluntariness of Swift's resignation.  Id.  Here, the AJ found that Mikesh had raised a nonfrivolous allegation that her resignation was involuntary due to intolerable working condition, and thus granted her request for a hearing.  MSPB Ex. 1-a, Attach. 26, at 1.

unwarranted.  Cf. Allen v. Bridgestone/Firestone, 81 F.3d 793, 797 (8th Cir. 1996)

("Where, as here, employees are treated alike, 'no particular employee can claim that

difficult working conditions signify the employer's intent to force that individual to

resign.'") (citations omitted).  In fact, the evidence in the record supports the MSPB's

conclusion that FSW had reasonable grounds to issue the PIP and to threaten adverse

action.  Hartlieb was concerned that money was not in the appropriate accounts when

needed, the accounts were not balanced, and appropriate procedures for moving

money were not followed.  The budget analyst who replaced Mikesh, Carol Johnson,

testified that the accounts were not in very good shape when she started, and Mikesh

herself admitted during the hearing that the financial records were a mess.  Tr. at 32,

137.  "An employee is not guaranteed a working environment free of stress.

Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or

unpleasant working conditions are generally not so intolerable as to compel a

reasonable person to resign."  Miller v. Dep't of Defense, 85 M.S.P.R. 310, 322 (2000).

Based on this Court's review of the record underlying the Board's decision, the Court

finds that its conclusion that a reasonable person would not have felt that she had no

alternative but to resign was supported by substantial evidence and was not arbitrary,

capricious, an abuse of discretion or procedurally infirm.  On this basis, this Court

recommends that defendant's motion for summary judgment be granted.

### B.    Title VII, Rehabilitation Act, and Retaliation Claim

In her Complaint, Mikesh alleged the following in connection with her claims of

discrimination and reprisal: Mikesh was a qualified handicapped person, or was

perceived to be a qualified handicapped person within the meaning of the Rehabilitation

Act, and that defendant, through her managers, engaged in a practice and pattern of discrimination and harassment against her because of these handicaps or perceived handicaps in the terms and conditions of her employment.  Compl. ¶¶ 5-7.  In addition, Mikesh alleged that defendant denied Mikesh's request for reasonable accommodations for her handicaps or perceived handicaps.  Compl. ¶ 8.

As to her claim of gender discrimination, Mikesh alleged that defendant discriminated against and harassed her based on her gender in the terms and conditions of her employment.  Compl. ¶ 9(1).  Mikesh alleged she complained about defendant's discrimination in April and August 2001, and then defendant retaliated against her for complaining.  Compl. ¶¶ 9(2), 10.

Mikesh further alleged that her working conditions had become so intolerable that on September 5, 2001, she was constructively discharged.  Compl. ¶ 11.  On that day, she had suffered an emotional and mental collapse that rendered her incompetent to voluntarily resign her employment.  Compl. ¶ 12.  Consequently, Mikesh, with the help of her husband, submitted her resignation, and FWS wrongfully held her to it.  Compl. ¶ 12.

## 1.    Factual Record for Summary Judgment Motion

In addition to the administrative record, both Mikesh and defendant submitted evidence for the Court to consider in addition to the administrative record.  See Chandler v. Roudebush, 425 U.S. 840, n.39 (1976) (stating prior EEOC or agency administrative findings are admissible in federal court trials on employment discrimination claims).  Mikesh submitted a declaration by her and by Marie Niesen, an engineer with FWS who worked with Mikesh until she quit her employment in

September 2001.[16]  Mikesh also submitted MSPB exhibits, excerpts from the MSPB hearing transcript, and excerpts from her deposition.  Defendant submitted excerpts from Mikesh's deposition, the Complaint, excerpts from the MSPB hearing testimony, the Final Agency Decision, the MSPB decision, the Leave Sharing Program, Home Flex Time, the Resolution Agreement, discipline of Mikesh's prior supervisor, excerpts from the FWS manual, and excerpts from  the Report of Investigation.  The Court will not restate the facts from the administrative record, but only those additional facts submitted by the parties for consideration in connection with defendant's motion for summary judgment on Mikesh's discrimination and reprisal claims

In her declaration, Mikesh stated that when she returned to work after her March 2001 shoulder surgery on May 29, 2001, Hartlieb gave her a month to catch up with 2 ½ months' backlog of missed work while doing all her current work.  Mikesh Dec. ¶ 9.  Mikesh had about 170 projects to account for and numerous items to track within each project.  In addition to her normal duties, Milne asked Mikesh to write a computer program to project job costs.  Id. ¶ 9.  Mikesh is not a programmer, but had to write the computer program anyway.  Id.  Further, Mikesh stated that FWS never provided any coverage for her duties when she was absent for health reasons, and this created the "mess" that existed in the engineering accounts by September 2001.  Id. ¶ 10.

On February 15, 2001, Hartlieb, Mikesh's supervisor, e-mailed Mikesh to thank her for the information she provided on her past health conditions.  Mikesh Aff. Ex. D.  He expressed concern that the longer hours worked by Mikesh for credit hours

---

[16]    Niesen also appeared as Mikesh's representative at the hearing before the AJ. Tr. at 4.

appeared to have affected Mikesh's health condition, causing her to take sick leave that she did not have.  Id.  Hartlieb stated that if Mikesh continued to get sick, then he would suspend her use of credit hours until the problem was resolved.  Id.

Mikesh attached to her declaration letters from Dr. Monical and Dr. Twito, which address Mikesh's physical and mental conditions.  On February 28, 2001, Dr. Monical wrote a letter, entitled "To Whom It May Concern," which stated that Mikesh had been her patient for the last 2 ½ years and was suffering from severe depression, and that while she was taking medication and was going to counseling, she still had significant difficulties with her condition.  Mikesh Aff. Ex. A.  Dr. Monical explained that Mikesh had a difficult year, which included multiple medical problems  that had contributed to her current state of mind.  Id.  Dr. Monical noted that Mikesh had difficulties at work because of changes in management and increased pressure from other employees and supervisors.  Id.  Mikesh had difficulty coping with job demands and expressed difficulty concentrating at work.  Id.  Dr. Monical stated that because of her depression, Mikesh was unable to concentrate and do her job to the best of her ability.  Id.  In Dr. Monical's view, it was advisable for Mikesh to take some time away from work to get well.  Id.  Dr. Monical indicated that Mikesh would be taking medication and undergoing intensive therapy.  Id.

On March 5, 2001, Dr. Randy Twito sent a letter addressed "To Whom It May Concern" regarding Mikesh's right shoulder.  Mikesh Aff. Ex. B.  Dr. Twito stated that Mikesh had suffered a recurrent tear of her right shoulder in a fall.  Id.  Mikesh needed surgery to repair it and would likely need to be off work for 2-3 months following the repair to rehabilitate the shoulder.  Id.  Mikesh also suffered significant pain in the left

shoulder because of "an overuse phenomenon."  Id.  The left shoulder needed to be evaluated with a MRI to rule out similar pathology in the rotator cuff.  Id.

Niesen stated in her declaration that she observed that Mikesh took much time off for several surgeries in 2000 and 2001, because she had problems with her foot and shoulders due to broken ankles in a parachuting injury she suffered while in the Army or Reserves.  Niesen Dec. ¶ 4.  While she was away recovering, FWS did not have a person cover Mikesh's duties or maintaining a basic level of performance in her absence.  Id.  When she returned to work, Mikesh found a mess and it was difficult for her to catch up and keep up with her current job at the same time.  Id.

Niesen also stated that it was a common joke in the office, before and after Hartlieb left, that "whatever you do, don't get sick."  Niesen Dec. ¶ 5.  This was because Milne was hard on employees with medical problems when they missed work for illness, injury, or surgery.  Niesen Dec. ¶ 5.  While Niesen was the acting Regional Engineer, Milne told her that Mikesh (along with Steve Dedon and Marianne Dahl) was a problem employee who should be watched and that something needed to be done about her. Niesen Dec. ¶ 6.  Hartlieb was told the same thing.  Niesen Dec. ¶ 7.  Additionally, Hartlieb told Niesen he did not want Mikesh to leave, but that he was under pressure from Milne to get on Mikesh's case and he felt he had no other alternative but to carry out those orders.  Niesen Dec. ¶ 7.

In her deposition, Mikesh claimed that during the time Hartlieb was her supervisor she suffered from migraines, depression, and was recovering from surgeries, which Mikesh claimed are disabilities.  Mkesh Dep. at 65.  Mikesh stated that she prepared a letter in early 2001, informing Hartlieb of her illnesses, but could not recall if

she told Hartlieb that her illnesses were disabilities.   Mikesh Dep. at 66.   Mikesh recalled Hartlieb asking her when her illnesses would be healed.   Mikesh Dep. at 66. Mikesh stated that she asked for a chair and one was provided to her.   Mikesh Dep. at 67.   She also asked for a light, but she provided that herself.   Mikesh Dep. at 67. Mikesh testified that she was able to cook, vacuum, bathe, and drive during 2001, except for when she was recovering from surgeries.   Mikesh Dep. at 68.

Mikesh stated that she never knew that Milne told Hartlieb to stay on her back because she thought Mikesh took too much time off.   Mikesh Dep. at 77.   Mikesh then stated that while she was out of the office for surgery, no one covered her duties. Mikesh Dep. at 77.   Mikesh also testified that she never considered taking medical retirement and she would consider working at FWS again depending on the circumstances.  Mikesh Dep. at 78.

FWS also submitted several exhibits for consideration in connection with its summary judgment motion on Mikesh's claims of discrimination and reprisal.   On August 27, 2001, Hartlieb sent a memorandum to Mikesh, which provided additional information on her performance expectations and responded to her concerns regarding being asked to do other routine administrative duties.   Def. Ex. F.   Hartlieb stated that the PIP issued on August 20, 2001 was not an all inclusive list of Mikesh's administrative duties and expectations and that Mikesh was also expected to keep up-to-date all other financial management responsibilities and to assist with other office administrative functions.   Id.  Hartlieb stated that in the course of preparing the August 20, 2001 memorandum, individuals familiar with the Federal Financial System ("FFS") were consulted to ensure the expectations for correcting the deficiencies outlined in the

memorandum were reasonable and achievable.  Id.  Hartlieb also stated that Mikesh should be able to perform her other duties, too.  Id.  If Mikesh did not believe she would be able to perform her other duties, she was to advise Hartlieb in writing of the basis for her inability to perform and demonstrate how much time she would require to perform the duties and provide additional information upon request.  Id.  Lastly, Hartlieb reiterated that the goal of the August 20, 2001, memorandum was to correct Mikesh's performance deficiencies.  Id.  Mikesh was to inform Hartlieb if she needed any assistance from him in meeting her goal.  Id.

On August 27, 2001, Mikesh filed an EEO charge alleging that FWS had breached the May 24, 2001 Resolution Agreement.[17]  Def. Ex. H.

Further, Hartlieb stated in an affidavit that he was not aware that Mikesh had any physical or mental handicaps.  Def. Ex. F, at 1-3.  He was aware that Mikesh was diagnosed as clinically depressed.  Def. Ex. F, at 2-3.  Hartlieb had taken Terry Pennaz, Partick McDermott, Marie Niesen, and Marianne Dahl off flextime and credit hours, but now they are back on it because it is open to everyone and it is not at Hartlieb's discretion.  Def. Ex. F, at 4.  As to communicating with Mikesh, Hartlieb stated that he talked to her orally and e-mailed her because she had a problem remembering things.  Def. Ex. F., at 7.  Hartlieb stated that he had to go out of his way to make sure Mikesh had sufficient leave so in that respect he treated her differently.  Def. Ex. F, at 8.  Hartlieb stated that Mikesh's sex, physical and mental handicaps, and prior EEO activity were not factors in the alleged discrimination against Mikesh.  Def. Ex. F, at 10.

---

[17]     Mikesh resigned before the resolution of the charge was delivered on December 5, 2001.

Hartlieb only looked at Mikesh's job performance when evaluating her.  Def. Ex. F, at 10.

### 2.    Analysis of Summary Judgment Motion on Discrimination and Reprisal Claims

In order to evaluate Mikesh's claims under the Rehabilitation Act and Title VII, and her retaliation claim, the Court engages in the <u>McDonnell Douglas</u> burden shifting analysis.  <u>Allen v. City of Pocahontas, Ark.</u>, 340 F.3d 551, 557-58 (8th Cir. 2003) (Title VII); <u>Crawford v. Runyon</u>, 37 F.3d 1338, 1341 (8th Cir. 1994) (Rehabilitation Act); <u>Kim v. Nash Finch Co.</u>, 123 F.3d 1046, 1060 (8th Cir. 1997) (retaliation).  Generally, under the <u>McDonnell Douglas</u> analysis, "the claimant must first proffer a prima facie case of discrimination; the burden then shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action; and then the burden shifts back to the employee to show that the proffered reason is merely a pretext for discrimination."  <u>Allen</u>, 340 F.3d at 557-58; <u>see</u> <u>also</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

### a.    Gender Discrimination Claim

To establish a <u>prima</u> <u>facie</u> claim of gender discrimination under Title VII, plaintiff must show: "1) she was a member of a protected group; 2) she was meeting the legitimate expectations of her employer; 3) she suffered an adverse employment action; and 4) circumstances give rise to an inference of discrimination, as similarly situated employees, who are not members of the protected group, were treated differently."  <u>Jacob-Mua v. Veneman</u>, 289 F.3d 517, 521-22 (8th Cir. 2002) (Title VII).

The Court finds that Mikesh has not presented any evidence to establish that FWS discriminated against her based on gender.  In fact, Mikesh did not even address

gender discrimination in her brief.   Having failed to present evidence or argument on this claim, this Court concludes that it is abandoned.  See e.g., Thomsen v. Ross, 368 F. Supp.2d 961, 974 n.9 (D. Minn. 2005) (finding that a plaintiff had abandoned claims in his complaint that were not addressed in his summary judgment submissions).[18]

      b.   Disability Discrimination

To establish a prima facie claim under the Rehabilitation Act, Mikesh must show that: "(1) she is disabled within the meaning of the statute; (2) she is able to perform the essential functions of the job with or without reasonable accommodation; and (3) she has suffered an adverse employment action as a result of the disability."[19]  Joelson v.

---

[18]    For the reasons discussed below, the Court would have also found that the gender claim fails as a matter of law because Mikesh failed to show that she suffered an adverse action.

[19]    Disability is defined in 29 U.S.C. § 705(20), which states:

(A) In general

Except as otherwise provided in subparagraph (B), the term "individual with a disability" means any individual who--

(i) has a physical or mental impairment which for such individual constitutes or results in a substantial impediment to employment; and

(ii) can benefit in terms of an employment outcome from vocational rehabilitation services provided pursuant to subchapter I, III, or VI of this chapter [29 U.S.C.A. § 720 et seq., 771 et seq., or 795 et seq.].

(B) Certain programs; limitations on major life activities

Subject to subparagraphs (C), (D), (E), and (F), the term "individual with a disability" means, for purposes of sections 701, 711, and 712 of this title and subchapters II, IV, V, and VII of this chapter [29 U.S.C.A. §§ 760 et seq., 780 et seq., 790 et seq., and 796 et seq.], any person who--

(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities;

Department of Veterans Affairs, 177 F.Supp.2d 967, 970 (D. N.D. 2001) (citing Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994)).   "To show that she is disabled, a plaintiff must show that she has an impairment which substantially limits a major life activity."   Angier v. Henderson, No. Civ.00-215(DSD/JMM), 2001 WL 1629518, at *6 (D. Minn. Aug. 3, 2001) (citing Heintzelman v. Runyon, 120 F.3d 143, 145 (8th Cir. 1997).

FWS argued that the Complaint does not specify either the nature of the handicaps or any allegedly requested accommodations, and it does not describe any specific allegedly discriminatory actions.   Def.'s Mem. at 2.   FWS then argued that even if Mikesh's medical conditions were considered to be "handicapping" as claimed, the existence of such a condition does not relieve Mikesh of her obligation to perform the duties of her position at an acceptable level of competence.   Id. at 9.   Further, FWS asserted that Mikesh was obligated by law to inform FWS of her handicap and to request accommodations, but failed to do so.   Id.   FWS argued that to the extent Mikesh was unable to perform her duties and did not identify or request an accommodation enabling her to perform, Mikesh would not be considered to be a qualified handicapped individual within the meaning of the Rehabilitation Act.   Id. at 9-10.

Mikesh asserted that her physical conditions limited the major life activities of walking, reaching, lifting, and sitting.   Pl.'s Mem., at 3.   Mikesh also asserted that she suffered from migraine headaches, depression, foot and shoulder limitations, and pain.

---

(ii) has a record of such an impairment; or

(iii) is regarded as having such an impairment.

29 U.S.C.A. § 705(20)(A-B).

Id. at 14.  These psychological and physical conditions prevented her from performing many activities.  Id.  Further, when she had migraines or when depression would spike, Mikesh was totally disabled.  Id.  Mikesh contended that she informed FWS about her conditions and her need for absences due to her conditions, treatment, and surgery.  Id.

Mikesh's prima facie case of disability discrimination fails for two reasons.  First, she has not presented evidence to support the claim that she is disabled as defined by the statute.  While Mikesh argued that she is limited in the major life activities of walking, reaching, lifting, and sitting, and that when migraines or depression strike, she is totally disabled, there is no medical evidence to support such claims.  The only medical evidence presented was by Dr. Monical, Dr. Vize, and Dr. Twito.  Dr. Monical opined that Mikesh needed a break from work to deal with her depression.  Dr. Twito opined that Mikesh suffered a recurrent tear of her right shoulder in a fall and that she needed surgery to repair it and would likely need to be off work for 2-3 months following the repair to rehabilitate the shoulder.  Dr. Vize opined that Mikesh's depression was exacerbated by stress at work and that reasonable accommodations should be made in her work environment to accommodate her situation, such as clear communication about job responsibilities and adequate time to fulfill her job responsibilities.  Dr. Vize did not know how long the condition would last.  None of these medical providers opined that her conditions were permanent or that Mikesh suffered from a long-term inability to work.  Angier, 2001 WL 1629518, at *7.  To the contrary, Dr. Monical stated that Mikesh needed a break from work, but did not indicate that she needed a permanent break and Dr. Vize stated that with reasonable accommodations, Mikesh could function at work.  Further, in the Complaint, Mikesh asked to be reinstated.

Compl. ¶ E.  Mikesh also had her own business where she worked from home.  Tr. at 64.  "Because statutory disability requires permanent or long-term limitations, this evidence of [plaintiff's] employability undercuts her claims that she qualifies for protection under the Rehabilitation Act."  <u>Angier</u>, 2001 WL 1629518, at *7.

Second, Mikesh's disability claim fails because she cannot make out an adverse action.  Mikesh claims that the adverse action was her constructive discharge.  In response, FWS asserted that it bent over backwards to keep Mikesh employed and productive—FWS granted Mikesh extended leave, flex-time work at home, and leave sharing opportunities.  Def.'s Mem. at 17.  Further, FWS contended that Mikesh had serious performance problems, which it sought to address.  <u>Id.</u> at 18.

Mikesh alleged that she was constructively discharged based on her disabilities through the creation by her supervisors of a hostile work environment designed to, or with the foreseeable consequence of, causing her to quit her job.  Mikesh argued that FSW's management created intolerable working conditions—Hartlieb, instructed by Milne, "hounded, badgered, threatened and harassed her."  Pl.'s Mem., at 14.  Mikesh also asserted that FSW management was "getting on her case" because she was perceived as a "problem" due to her absences required by her multiple medical conditions and depression also made her working conditions intolerable.  <u>Id.</u> at 18. Mikesh maintained that FWS management papered her file with warnings and a PIP, and that Hartlieb yelled at her to such an extent that her co-workers noticed it.  <u>Id.</u> Mikesh claimed that on September 5, 2001, the day she resigned, she was crying, "rattling" incoherently, curled up on the floor—at that point, she felt that her working conditions were intolerable.  <u>Id.</u> at 17.

Constructive discharge occurs when an employer "deliberately renders the employee's working conditions intolerable and thus forces the employee to quit [her] job. Allen, 81 F. 3d at 796 (quoting Johnson v. Bunny Bread Co., 646 F.2d 1250, 1256 (8th Cir. 1981). Thus, in order to show that she was constructively discharged, Mikesh must show that FSW's actions were intended to force her to quit. Hukkanen v. International Union, 3 F.3d 281, 285 (8th Cir.1993). "Constructive discharge plaintiffs . . . satisfy Bunny Bread's intent requirement by showing their resignation was a reasonably foreseeable consequence of their employers' discriminatory actions." Hukkanen, 3 F.3d at 285. In order to prove that a constructive discharge occurred, the plaintiff must demonstrate that a reasonable person would find the working conditions intolerable. Bunny Bread, 646 F.2d at 1256. Intolerable working conditions are judged by an objective standard, not the plaintiff's subjective feelings. See West, 54 F.3d at 497 ("An employee may not be unreasonably sensitive to [her] working environment. A constructive discharge arises only when a reasonable person would find [her working] conditions intolerable.") (citing Bunny Bread, 646 F.2d at 1256). "An employee who quits without giving her employer a reasonable chance to work out a problem is not constructively discharged." Id. at 498. "Part of an employee's obligation to be reasonable is an obligation not to assume the worst and not to jump to conclusions too fast." Smith v. Goodyear Tire & Rubber Co., 895 F.2d 467, 473 (8th Cir. 1990) (emphasis in original); Gartman v. Gencorp, Inc., 120 F.3d 127, 130 (8th Cir. 1997) (same).

The Court finds that Mikesh was not constructively discharged because there is no evidence that Mikesh gave FWS an opportunity to work out her problems before she

resigned.  In fact, the record shows that to the extent that Mikesh had filed complaints with management in the past, those claims were addressed.  Additionally, Mikesh never told anyone that Hartlieb's management style was forcing her to resign.[20]  Thus, instead of giving FWS a chance to rectify the situation, she quit.  Under such circumstances, this Court concludes that as a matter of law, Mikesh's resignation does not amount to a constructive discharge and consequently, she cannot make out a prima facie case of disability discrimination because she did not suffer an adverse action.

For all of the above reasons, this Court recommends that FWS's motion for summary judgment on Mikesh's disability claim be granted.

c.    Retaliation Claim

In order to establish a prima facie case of retaliation under Title VII and the Rehabilitation Act, Mikesh must show: "(1) protected activity, (2) subsequent adverse employment action, and (3) a causal relationship between the two."  Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8 Cir. 1997) (citing Kobrin v. University of Minnesota, 34 F.3d 698, 704 (8th Cir.1994) (Title VII retaliation claim); Lindgren v. Camphill Village Minnesota, Inc., No. Civ.00-2771 RHK/RLE, 2002 WL 1332796, at *11 (D. Minn. June 13, 2002) (Rehabilitation Act retaliation claim).

As detailed above, Mikesh has failed to show she suffered an adverse employment action because she failed to show that she was constructively discharged from FWS.  Therefore, having failed to make out a prima facie case, this Court

---

[20]    To the extent Mikesh filed a claim on August 27, 2001, the purpose of the claim was to address the breach of the Resolution Agreement—not to address how Hartlieb was treating her on a day-to-day basis.  Further, Mikesh resigned before FWS even had an opportunity to even investigate, much less, resolve that claim.

recommends that FWS's motion for summary judgment be granted on her reprisal claim.

## III.   __RECOMMENDATION__

For the reasons set forth above and based on all the files, records, and proceedings herein, IT IS RECOMMENDED that defendant's Motion to Dismiss, Alternatively for Summary Judgment [Docket No. 15] be GRANTED.

Dated:        February 7, 2006

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **February 27, 2006** a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **February 27, 2006**.